ECK v. KUTZ.

(Circuit Court, E. D. Pennsylvania. September 23, 1904.)

No. 34.

1. PATENTS—NOVELTY—FILE WRAPPER AND CONTENTS—REJECTED FEATURES.

The cancellation in the Patent Office, on references cited by the examiner, of a part of the original application in which one feature of the patent as finally allowed is claimed, does not estop the inventor from asserting the novelty of that feature, where the defendant is sought to be held for infringement of the whole combination of which it forms a part.

2. SAME—CONSTRUCTION.

Undoubtedly a patent must be taken with all its limitations, and resort may be had to its course through the Patent Office to determine them; neither can rejected features be reasserted, nor a broad construction be insisted on, where a narrow one has been accepted by amendment to meet the objections of the examiner. But, subject to this, the patentee is entitled to have his patent taken as it reads, with due regard to the inventive idea embodied in it, without having it treated in such a way as virtually to destroy it.

3. SAME—DATE OF INVENTION—DEGREE OF PROOF REQUIRED TO ESTABLISH.

Where the date of an invention contended for depends on the mere say-so of the inventor and his son, without any convincing or corroborating circumstances, this does not fulfill the high degree of proof required to escape anticipation.

4. SAME—ANTICIPATION—PRIOR PATENT—DATE OF APPLICATION.

The effect of a patent as an anticipation is to be determined by the date it was issued, and not by that when it was applied for. However, it may be otherwise, when the question is as to who was the original or first inventor. Bates v. Coe, 98 U. S. 37, 25 L. Ed. 68, followed. Westinghouse v. Chartiers Valley Gas Co. (C. C.) 43 Fed. 582, and Barnes Automatic Sprinkler Co. v. Walworth Mfg. Co., 60 Fed. 605, 9 C. C. A. 154, distinguished.

5. SAME—PRIOR ART—UNPATENTED DEVICE OF SAME INVENTOR.

The unpatented device of the same inventor cannot be regarded as part of the prior art, so as to compel him to face it as an anticipation, or prevent him from drawing upon it in the development of his ideas, where it has not been relinquished by two years' prior use or sale.

6. SAME—NOVELTY—INVENTIVE SKILL—EFFORTS OF OTHER INVENTORS.

Where it is established, by the references cited, that one of two contested features of the combination patented is lacking to a certain extent in novelty, but the other is not, nor admittedly is the whole, and all that can be said against the invention is that the existing art has been somewhat drawn upon, but this has not been without new and independent treatment, nor so but that the conjoined result in form and function is the inventor's own, this is not sufficient to negative novelty or inventive skill, of the existence of which the efforts of other inventors in the same direction are to be accepted as persuasive proof.

7. SAME—INFRINGEMENT—FORM.

Except where form is of the essence, it has little weight; and departure from it does not escape infringement, where identity of operation is retained.

8. SAME—DIVIDING UP OF PARTS.

Where, therefore, a cross-arm, actuated by a lever, and engaging the outer arm of a dropper or throwing-down cam, called for by the patent, was divided up into two, which were separately pivoted, but retained the

¶ 7. See Patents, vol. 38, Cent. Dig. §§ 24, 372.

same relative position and did the same work as the single cross-arm of which they took the place, and the outer arm of the dropper was similarly divided up and doubled, and given certain other minor peculiarities of construction, but with all this the operation, not only of the whole, but of each part, was essentially unchanged, this constituted an infringement.

**9. SAME—KNITTING MACHINES.**

The Eck patent, No. 523,111, for a knitting machine, was not anticipated as to the combination or parts shown in claims 3 and 5, although some of the parts were old. It also shows invention, and is infringed.

**10. SAME—NOVELTY—OLD PARTS—PATENTING OF SIMILAR DEVICE BY DEFENDANT.**

The novelty of an invention is never negatived merely by proving that it is made up of old parts. The question is whether they have been newly combined, so as to effect new and useful results. Where this is fairly shown, and the defendant has asserted the novelty of a similar device by having it patented, he cannot well complain that the same conclusion is reached with regard to that of the complainant after which he has patterned.

**11. SAME—PRIORITY OF INVENTION—INTERFERENCE PROCEEDINGS—DISCLAIMER.**

The fact that, after interference proceedings had been declared between two applications for patents for the same device, one of the applicants entered a disclaimer in favor of the other, while not conclusive as to a third party, who may still show that such disclaiming party was the real inventor, it is strong evidence to the contrary, although, when the withdrawal is the result of a compromise in which the withdrawing party is given large privileges, it is not so significant as if the withdrawal was purely voluntary.

**12. SAME—DATE OF INVENTION—ABANDONMENT.**

Abandonment is not to be predicated upon mere delay. Where, therefore, the complainant, as early as July, 1891, had a complete conception of his device substantially as it now appears, which he reduced to practical form, he has the right to claim this as the date of his invention; and it cannot be regarded as abandoned simply because, for business and other reasons, he let the matter rest for upwards of three years, having eventually in September, 1894, put his ideas into exact shape.

**13. SAME—INVENTION—REASONABLE DILIGENCE—RULE WITH REGARD TO.**

An inventor, if he keeps his ideas to himself, can take his own time to develop and perfect them, subject, only, to the risk that others meanwhile may become independently possessed of them. To obviate this he is held to the exercise of reasonable diligence; but the neglect of it goes merely to the question whether he should be given a patent as against intervening rights. It has no bearing on the issue whether he was in fact the original and first inventor.

**14. SAME—DELAY OF THREE YEARS.**

Evidence examined, and *held* to establish reasonable diligence under the circumstances, notwithstanding a delay of upwards of three years.

**15. SAME—RECITALS IN PATENT.**

Although it is recited in a patent that the invention is an improvement upon another and prior one by the same inventor, he is not precluded, by accepting it in that form, from establishing that the inventive idea of which it is the embodiment was antecedent to that, so as to carry his invention back of it, and prove that he was the original and first inventor.

**16. SAME—INVENTIVE DISCOVERY—WHAT.**

Inventive discovery, under the patent law, involves the intelligent apprehension of relations not before recognized by others, although actually existing, followed by the conception of how they can be practically utilized.

**17. SAME—DISPENSING WITH USELESS PARTS.**

　　Even though a prior machine was capable of being made to operate in the same way as that of the complainant by discarding certain devices, but it was not arranged to do so, it cannot be said that the difference between the two consists merely in the rejection of useless and functionless parts, which involves no invention; the devices dispensed with having a specific function as employed, and being rendered unnecessary only by the substitution of that by which they were made so, and it having remained to the complainant to perceive and develop this possibility, which was not recognized by the author of the prior machine, although a skillful inventor.

**18. SAME—INFRINGEMENT—KNITTING MACHINE.**

　　The Eck patent, No. 592,134, for a knitting machine, construed as to claims 2, 5, 8, 9, and 14, and *held* not anticipated and to disclose invention. Claims 8, 9, and 14, covering free narrowing cams or lifters in combination with two-needle widening cams or droppers, for use in a two and one machine, also *held* valid as against the contention that the patentee was not the original and true inventor and that he had abandoned the invention; and all of said claims *held* infringed.

　　In Equity. Suit for infringement of letters patent No. 523,111, issued July 17, 1894, and No. 592,134, issued October 19, 1897, both granted to James L. Eck, for improvements in knitting machines. On final hearing.

　　Joseph C. Fraley and Henry N. Paul, Jr., for complainant.
　　Charles Howson, for defendant.

　　ARCHBALD, District Judge.* The mechanical devices which are the subject of the present suit are designed as constituent parts of machines for knitting stockings, and have to do with fashioning the heels and toes. Knitting machines of this character—aside from the driving parts—consist essentially of a series of vertically movable needles, surrounded by a cylinder provided with inwardly projected cams, which form a race or course, along which, when the cylinder is revolved, the needles are forced to run by the engagement of the cams with their outwardly protruding hubs or butts. In knitting the legs and feet of stockings the full circle of needles is employed; but, when a heel or toe is to be formed, half of them must be put out of action, and they are accordingly raised to a level where they will not be affected by the cams, while the other half continue knitting, the cam cylinder being reciprocated back and forth for that purpose. The heel or toe is formed by first narrowing and then widening, and this is accomplished by throwing up a needle at each end of the active row, with each reciprocation, in the one process, and conversely by throwing down into operation, one at each end of the idle row, with each reciprocation, in the other; and when this is completed, and full knitting is to be resumed, the half of the needles at the back of the machine which were left inactive must be thrown down in a body, so as to be in position for action again. Originally the "half back" needles, as they are called, had to be "picked up" and "picked down" by hand, and the same was true of the single needles, in narrowing or widen-

　　* Specially assigned.

ing. The reciprocation of the cylinder was also produced manually, the driving crank being first turned one way and then the other. The whole time and attention of the operator was thus monopolized, and one was required for each machine. Progress in the art has been in the direction of dispensing with this constant supervision and intervention, and in making the machine more and more self-regulating. In this way, first semi-automatic, then three-quarters automatic, and finally seven-eighths (or, as some profess, fifteen-sixteenths) automatic, machines have been developed; in the later of which the attention of the operator is required at only one or two points, and several machines may be managed at the same time.

It is to this improvement in the art that the appliances devised by the complainant are addressed, and there can be little doubt as to their entire effectiveness for the purpose for which they were designed. The first to be brought forward was one relating to the throwing down of the needles in the process of widening. It is covered by the patent 523,111, issued to the complainant July 17, 1894, and will be first considered. The third and fifth claims, which are the ones here relied upon, are as follows:

"(3) In a knitting machine, the combination with the cam cylinder, provided with a race for the needle hubs, of pivoted arms, throwing down spring-pressed cams or levers, movable with said pivoted arms and also having separate movement thereon, and a lever for throwing said cams into and out of operative position."

"(5) In a knitting machine, the combination with the cam cylinder, provided with a race for the needle hubs, of spring-pressed pivoted arms, a vertically movable cross-arm engaging the same, and cams pivotally connected with said pivoted arms and being movable therewith, and also having a spring-controlled movement thereon, substantially as described and for the purposes specified."

As shown by the specifications and drawings, the so-called "droppers" which are thus described are two in number, each made up of two arms pivoted together; one being located within, and one without the cam cylinder, and each arm being independently spring-pressed into normal place. The inner arm is cam-shaped, and has a hooked end, with which to engage the needles, and when intended to operate stands squarely in their path. Each dropper in this position is so stationed and arranged as to arrest and throw down with each reciprocation of the cam cylinder the end needle of the series advancing towards it, while at the same time it permits the passage of the whole of them unaffected over it upon their return. The mechanism by which the droppers are co-ordinated and controlled consists of double cross-arms on the outside of the cam cylinder, extending from one dropper to the other, and engaging a lug on the exterior arm of each; the said cross-arms being capable of being shifted vertically upon a central pin and slot, under control of a radially projecting lever pivoted centrally between them. The operation of the lever and cross-arms was not confined in the original invention to the droppers, but extended to the throwing-up cams or lifters as well, so that as the one were thrown into operation the others were thrown out, and vice versa; and this dou-

ble arrangement is made the subject of certain claims of the patent. But this does not affect those which are here in controversy, which are distinguished from them; the inventor having divided up his conception, and made separate claim for the droppers with their controlling mechanism by themselves. The claims before us are also distinct from each other; the central lever, without mention of the cross-arms by which motion is communicated to the droppers, being specified in the third; while the cross-arms, without mention of the controlling lever, are claimed in the fifth; although the omitted element or its equivalent would seem to be essential and to be implied in each.

It is conceded that there is no exact counterpart to be found in the prior art for the combination which is thus brought together in these claims. But it is contended that each of its distinctive features appears there in substantially the same form and invested with the same functions, and that it involved nothing inventive or patentably novel to combine them; or, if it be conceded that a certain margin of invention was left open, it was a narrow one, calling for a strict construction, against which the defendant, who has a special mechanism of his own, does not offend. Apart from the cam cylinder, the device embodied in these claims essentially consists of the two general elements, the droppers and the mechanism for controlling them, each of the particular character described, and the first question is as to their independent novelty. Except upon the basis suggested, this is not material, if the whole combination is novel; but the discussion is necessitated by the argument, and in any event will not be without profit.

It is contended, however, with regard to the droppers, that the complainant is estopped from asserting that they were not anticipated by the prior art, having canceled in the Patent Office, on references cited by the examiner, that part of the original application in which this feature was specifically claimed. This would no doubt be true, if effort was now being made to hold the defendant for the use of this single feature of the combination, apart from the rest. But that is not the case. The complainant charges the appropriation of the whole invention, and it is difficult to see on what principle he should be debarred from showing the novelty of its different features, if necessary in order to maintain its validity as it was finally allowed. This is not impugning, but upholding, the rulings of the Patent Office, going to show, as it does, that the patent was properly granted, upon whatever ground assailed.

Neither am I able to concur in the further contention, which is made in the same connection, with regard to the other element of the combination, that, because of the rejection of a claim for vertically movable cross-arms controlling the throwing-up cams or lifters, the complainant is estopped from claiming that he was the first to devise controlling mechanism for a "picker" of any kind, either dropper or lifter. A dropper is not a lifter, nor able by any means to be similarly treated. But, more, than that, the argument that there is no patentable difference between the claims with regard to the droppers, which were allowed, and those with regard

to the lifters, which were not, seeks to establish the invalidity of the one by the rejection of the other, in the very face of their allowance, a result which would certainly be anomalous. Undoubtedly a patent must be taken with all its limitations, and resort may be had to its course through the Patent Office to determine them; neither can rejected features be reasserted, nor a broad construction be insisted on, where a narrow one has been accepted by amendment, to meet the objections of the examiner. But, subject to this, the patentee is entitled to have his patent taken as it reads, with due regard to the inventive idea embodied in it, without having it treated in such a way as would virtually destroy it.

This clears the way for the consideration of the prior art, and that with respect to the droppers will first be considered. While July, 1893, is the earliest date that can be assigned for the successful reduction to practice of the entire invention, it is claimed that the double-jointed droppers were devised in July, 1892, a year previous. It is so testified by the complainant, as well as by his son Elmer, and the original cam cylinder which is said to have been fitted with a dropper of this character is produced to further verify it. But the complainant is a highly interested witness, and his son is not much better; nor does the cam cylinder prove anything by itself, however primitive, being adaptable to whatever date may be assigned to it. The earlier date contended for rests, therefore, upon the mere say-so of the father and son, without any corroborating or convincing circumstances, which hardly fulfills the high degree of proof required when the date of an invention is material in order to escape anticipation. Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 11 Sup. Ct. 846, 35 L. Ed. 521; Westinghouse Electric & Mfg. Co. v. Saranac Lake Electric Light Co. (C. C.) 108 Fed. 231.

But, if July, 1893, is to be taken as the date, not only of the whole, but of each element, of the invention, there was no particular novelty at that time in a double-jointed dropper. This cannot be predicated, however, upon the Kelly (1889), the first reference which is cited against it. This machine shows a throwing-down, spring-pressed cam, located within the cam cylinder, in the path of the incoming needles, and adapted to yield to the outgoing ones, to which extent in form and function there is a correspondence with that of the complainant. But, in place of the exterior arm of the Eck, Kelly has a slide, on which the inner arm is pivoted, a material difference, as is proved by the use which is able to be made by Eck of his outer arm in adapting the controlling mechanism. Kelly may have had the idea of a double-yielding part, the same as Eck; but each developed it differently, and the difference is distinctive. The Mayo (1891) is single-jointed, and is admittedly only brought forward because the pivoting is outside the cylinder, showing that this was not new with Eck. To a certain extent, also, as another common feature, the droppers may be said to be spring pressed into position, but only when released from the latch by which each is severally caught and locked out at each reciprocation of the cylinder. The Hirner (1892) stands about as the Mayo, the droppers being

single-jointed, exteriorly pivoted, and spring-pressed into opera-
tion. But they swing radially, on an inclined axis, from the in-
terior outwards, through a slot in the cam cylinder, and are thrown
and latched out of position, reciprocally with the lifters, by co-
ordinated controlling mechanism, as to which the machine is a
much more significant reference than the other feature. The Sed-
mihradsky (1892), however, undoubtedly shows a double-jointed drop-
per with an exterior and interior arm; the latter also being spring-
pressed. It was upon this reference in the Patent Office that the
independent claim for droppers of this character was abandoned by the
complainant, and upon it their want of novelty must also be declared
here. It is complained that this patent does not disclose an operative
machine, and that the droppers are not capable of certain functions to
be found in the Eck, being severally thrown and latched out of posi-
tion with each reciprocation like the Mayo. But I am not con-
vinced of the one, and in the present connection the other is immaterial.
The Breaithwaite and Hepworth also has a double-jointed drop-
per, and in other respects, possibly, fulfills the terms of the claims
under discussion. But it is too late as an anticipation, and it is not
necessary, therefore, to dwell upon it. The patent, although ap-
plied for October 15, 1892, was not issued until June 5, 1894, and
it is by this that its effect as an anticipation is to be determined.
Novelty being already negatived by the Sedmihradsky, this rul-
ing is not important, and I will therefore simply refer, to sus-
tain it, to Bates v. Coe, 98 U. S. 37, 25 L. Ed. 68, and Diamond
Drill & Machine Co. v. Kelly (C. C.) 120 Fed. 282. The issue, in
Westinghouse v. Chartiers Valley Gas Co. (C. C.) 43 Fed. 582, and
Barnes Sprinkling Co. v. Walworth Mfg. Co., 60 Fed. 605, 9 C. C.
A. 154, relied upon by the defendant, was who was the original or
first inventor, which, notwithstanding the amended answer, I do
not consider to be raised here; the denial being directed to a part,
and not to the whole, invention.

But, if entire novelty cannot be maintained with regard to dou-
ble-jointed droppers, the same is not the case as to the co-ordinated
controlling mechanism, the other element of the combination. The
Lippitt and Pope (1890), it is true, shows mechanism more or less
intended to act co-ordinately with respect both to the lifters and
the single double-acting dropper with which the machine is equip-
ped; and if the first claim of the patent before us was in issue,
where both lifters and droppers are put together, this might be
pertinent. But admittedly there are specific differences between
this device and that of Eck, which is now under consideration;
and this is particularly so with respect to the double-acting drop-
per, which the controlling mechanism does not undertake to put
into operation, but only to throw and latch out, which in purpose
and contrivance is materially variant. The most that can be said
for this reference is that it discloses a certain character of co-
ordination, of which a centrally pivoted rocking cross-arm is a
part. The Rightmire (1889) also has a cross-arm, which moves ver-
tically; but all it effects is to shift certain springs, so that which-
ever one of the lifters happens to be in a certain position may be

acted upon by them. The lifters, however, are neither actuated directly nor simultaneously by the cross-arm; and while there is a certain co-ordination, by which, when the lifters are thrown into operation, the single double-acting depresser is taken out, it is accomplished by such entirely different mechanical means as to be neither similar to nor suggestive of that which is employed in the device which we have here. As in the Lippitt and Pope, the idea of co-ordination is present, and a cross-arm is made use of; but that is all its relevancy. The Boas (1891) shows nothing more than a double switch arrangement in the needle race, operated by a radial lever moving vertically, by means of which any number of needles may be switched up or down, out of or into action. Except, however, that it is a lever somewhat similar to that employed by the complainant, it is of no significance. It would have much more, as it seems to me, with respect to switching-up or switching-down cams, with which we shall have to deal later. The Branson was not issued until January 21, 1896, although applied for May 5, 1888, nearly eight years earlier, and therefore falls within the rulings made with regard to the Breaithwaite and Hepworth. It is only brought forward, moreover, as evidence that the co-ordinated control of the droppers, by the operation of a radially arranged lever, was not new, which is not very material. Neither is there anything in the Reid and Stevenson reissue (June, 1893) which requires discussion; the attempt to liken the vertically moving cam slide and the detached tripping lever by which it is actuated, to the cross-arm and lever of the Eck, being very far-fetched. The machine which the Boss Knitting Machine Company put out in the period from June, 1892, to the summer of 1893, is also relied upon. This machine had a handled lever, pivoted on the outside of the cam cylinder, which operated, by means of a sliding slotted end, to throw the lifters in and out. But, whatever the argument to be drawn from this mechanism, it is not to be taken as part of the prior art. While the machine was put out by Eck and his business associates, and sold extensively, the device, such as it was, was his invention, and although he may not be able to tack the present one onto it, so as to carry the latter back of the date already assigned, there is no reason why he should have to face it as an anticipation, not having relinquished it by two years' prior use or sale, or why, being still his own, he should not draw upon it in the development of his ideas. The whole invention would not be affected under like circumstances, and neither, therefore, should a part. Draper v. Wattles, 3 Ban. & A. 618, Fed. Cas. No. 4,073.

While, therefore, it is established by this review of the references that one of the contested features of the combination is lacking to a certain extent in novelty, the other is not; nor, admittedly, is the whole. All that can be said against the invention, therefore, taking it by and large, is that the existing art has been somewhat drawn upon. But this has not been without new and independent treatment, nor so but that the conjoint result, both in form and function, is the inventor's own. Eck did not simply take the double-jointed, spring-pressed dropper of the Sedmihradsky, and pivot it outside, like the Mayo or the Hirner; but with inventive skill he gave it new and more certain action, both with respect to the incoming, and particularly the outgoing, needles.

But, more than this, dispensing with the latching in and latching out process, he co-ordinated his droppers, by simple but effective controlling mechanism, not only so as to make them easily manipulated by the operator, but also capable of automatic direction by other parts of the machine, where that was desired. That this involved invention, and not mere adaptive skill, I am fully persuaded, of which the many and varied efforts of other inventors in the same direction, to be found in this record, would be persuasive evidence, if there was nothing more.

It is contended, however, that the complainant, in view of what is disclosed by the references cited, is to be confined to his own special and distinctive mechanism, and that on this the defendant does not infringe. It may be that the invention is not entitled to any great liberality of construction, but it is not cut off from the benefit of all equivalents; neither can I see that it is restricted, to the extent of relieving the defendant, by anything in the prior art. The question is whether the inventive idea expressed in the patent has been appropriated; and, if it has, infringement is made out. Two features, at least, of the complainant's device, have been adopted by the defendant, with hardly a shade of modification—the throwing-down cams or inner arms of the dropper, and the vertically moving lever, extending radially from the cam cylinder, by which they are moved in and out of position. These inner arms or cams are also spring-pressed, and are pivoted upon the outer arms, moving with them and having separate movement thereon; and—fulfilling the terms of the specifications, if not of the claims—the lever is held in place by friction plates. Each of these parts, moreover, performs the same function as the complainant's, so that form and function combine to identify the two. It is only with respect to the parts intermediate between these—the exterior arm of the droppers and the cross-arms engaging the same—that there is a difference; and this is effected solely by an overelaboration, which is hardly sufficient to deceive. The single cross-arm, which is actuated by the lever and itself engages the outer arm of the dropper, is divided up into two, which are separately pivoted, but retain the same relative position and do the same work as that of which they take the place; and the outer arm of the dropper is similarly divided up and doubled, and is given an inclined axis, and made to swing in and out through the cam cylinder, like the Hirner. But with all this the operation is essentially unchanged, not only of the whole, but of each part; and that is the significant thing. Except where form is of the essence, it has little weight (Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935); and departure from it does not escape infringement where identity of operation is retained (Paxton & O'Neill v. Brinton [C. C.] 107 Fed. 137), which plainly is the situation here. Without attempting to devise anything novel of his own, the defendant has appropriated all the distinctive features of the complainant's machine, merely making certain minor changes, which do not affect their individual function or their relation to each other. This constitutes an infringement within the meaning of the law.

The second device which is litigated relates to the switching-up and switching-down cams, with the appliances for controlling the same, by which the half-back needles are thrown up or down, out of or into action, at the beginning or end of fashioning. This is embodied in patent 592,134, issued to the complainant October 19, 1897, on an application filed May 17, 1895, claims 2 and 5 of which are as follows:

"(2) In a knitting-machine the combination with the cam-cylinder of two oppositely-inclined switch-cams radially movable through openings in the cylinder-wall exterior shanks on said cams provided with retracting-springs, a rocking lever adapted to engage one or other of said cam-shanks when moved from its central position, and a vertically-arranged shaft, provided with a cam engaging said rocking lever and adapted to operate the same, substantially as set forth."

"(5) In a knitting-machine, the combination with the cam-cylinder, and the radially-movable switch-cams having shanks, of a rocking lever having its ends arranged to engage and move said shanks inward, and a cam engaging said lever and rocking the same, for the purpose specified."

So far as its novelty is concerned, this device is in very much the same situation as that which has just been disposed of. Certain independent features of it are to be found in the prior art, but not the combination as a whole, nor anything like it. The suggestion that it is a "mere aggregation of old elements, involving no new mode of operation or result," I will not stop to discuss. As expressed in the more specific of the two claims, the combination may be regarded, for the purposes of this discussion, as made up of three essential parts: (a) The two oppositely inclined switch cams, radially movable through openings in the cylinder walls, and having exterior shanks provided with retracting springs; (b) a rocking lever adapted to engage one or other of such shanks when moved from its central position; and (c) a vertically arranged shaft, provided with a cam engaging the rocking lever, and adapted to operate it. The references cited go to one or the other of these separate elements.

Oppositely inclined, radially movable switch cams are not new, being found in the Sedmihradsky (1892), already referred to, which also shows an exterior shank provided with a spring. This spring, however, is not a retracting one, so as to normally withdraw the switch cams out of operation, as in the complainant's device, but is so arranged as to project them into position, except as they are positively withdrawn and locked out by the action of the operator. Having to be independently manipulated, it might easily happen, therefore, unless care is exercised, that both cams would be found in the path of the needles, to the ruin of the work in hand. In the first Denney (1894), however, this mistake is avoided; the spring being retracting, the same as in the Eck. But here, again, there is only a single cam to switch up the needles, and none to switch them down; and the same is the case in the Paxton and O'Neill (1894). It may be that by resorting to the second Denney (1895), where just the opposite is shown, double, complementary, oppositely inclined cams, fitted with retracting springs, could be made out; and it would seem to involve little, if any, inventive skill to so com-

bine the two,. particularly in view of the Sedmihradsky. On the strength of this reference, therefore, I am forced to conclude that there was no special novelty in this feature.

It is urged, however, that the switch-down cam of the complainant is arranged to project further into the path of the needles than the switch-up cam, a necessary provision in order to carry down all the needles at the end of widening, in a machine operating on the two and one principle, like the complainant's, of which we shall hear more later; and that this differentiates it. The ordinary expedient by which the switch-up cam is made to select and raise the half-back needles, and none other, is by giving these needles longer butts, the cam being projected inwardly just far enough to engage these and escape the others; and this would be sufficient, of course, to switch them down again. But in a two and one machine a short-butt needle is always left up at the end of widening, along with the half-backs, and the switch down cam must therefore be so arranged in such a machine as to carry this down with the others, which is accomplished by the complainant by projecting the cam in far enough to catch both. This arrangement cannot be claimed for the Sedmihradsky; for, although shown in the model exhibited, it is not in the patent, with which the model to this extent does not conform. But it is to be found in the second Mayo (1891), a two and one machine, as well as in the Rightmire (1891), and is not, therefore, novel. But, more than this, however important to the operation of a two and one machine, and whatever the use made of it by the complainant in practice, not only is it not claimed in his patent, but it is not even referred to there, the only trace of it being an obscure suggestion in one of the drawings; and it is of no possible significance, therefore, in this discussion.

The attempt to draw anything from the Paxton and O'Neill, the Rightmire, or the Mayo, by way of anticipation of other parts of the complainant's mechanism, calls for little comment. These references simply disclose exterior controlling devices of one sort or another, unsuggestive except in the remotest and most general way. A rocking lever is shown, however, in the two Denneys, similar in form to that employed by the complainant, and acting upon studs or shanks projecting through the cam cylinder. But it is applied to the control of tripping studs, for the purpose of throwing into operation either the lifters or the droppers, whichever may happen to be desired; a different function although somewhat similarly performed. Found, as it is, in another and distinct combination, it has no relevancy, except as it is thereby shown to be an ordinary device. But the novelty of an invention is never negatived merely by proving that it is made up of old parts. The question is whether they have been newly combined, so as to effect new and useful results, and there can be little controversy with regard to that here. The defendant has asserted the novelty of the device which he has got up by having it patented, and, while that may not be conclusive, he cannot well complain if we reach the same conclusion with regard to that of the complainant, after which he has manifestly patterned.

The real issue in this part of the case is as to infringement; and here, again, the situation is much the same as was found with regard to the droppers and their controlling mechanism. Not only has the defendant appropriated the inventive idea, taking it as a whole, but he has substantially copied the different parts, varying in form only, and not in function or operative effect. He employs two oppositely inclined, and complementary switch cams, movable through openings in the cam cylinder, and having exterior shanks provided with retracting springs, which hold them normally out of operation. The only attempted distinction is that the switch cams rotate or swing in and out through the cylinder on an exterior axis, and do not move radially, as called for in the patent. But it is conceded by the defendant's expert that to a certain exent there is radial motion, so that it is only a question of degree, and the patent does not say how much. Aside from this, however, the motion is substantially radial, its character as such not being affected by the circumstance that, axially considered, it may be also rotary. The cams move radially with respect to the exterior surface of the cylinder, and that decides it. It is said, however, that there are no springs on the shanks; but this is almost a quibble. The patent merely requires that the shanks shall be provided with them, and that they certainly are.

The defendant also unquestionably has a vertically arranged shaft, provided with a cam, which engages that which takes the place of the complainant's rocking lever, thus appropriating another feature of the combination. This shaft takes the form of a vertical screw, the cam being made a constituent part of the operating handle pivoted upon it. The whole device, moreover, is so arranged, in exact counterpart with the complainant's, that when in extreme position in one direction one of the switch cams is thrown in, and when in extreme position in the opposite direction the other is; while intermediately, or when in central position, both are left uncontrolled, to be kept out, under the influence of their own retracting springs. With any variation whatever, it is difficult to see how much more complete identity could be found.

It is contended, however, that in no sense has the defendant a rocking lever, adapted to engage one or other of the cam shanks, when moved from its central position; the further element necessary to realize the complainant's combination. Instead of this, as is pointed out, there is a slide block and a handled lever, provided for moving it one way or the other; the slide block acting at either end on a bell-crank lever, which in turn engages the switch cams. But this is a rocking lever in effect, if not in form, which no splitting up into separate parts can obscure. Occupying, as it does, the same relative position, and adapted and intended to accomplish the same end, unless form is to govern, instead of substance, there is a clear equivalency between the two. Neither is there anything in the prior art which protects the defendant in his attempted substitution. We might imagine such a case if the tables were somewhat turned, and the defendant Kutz were pursuing another party for infringement of the patent he holds, assuming its validity. In that case, as I conceive, if the particular mechanical contrivance which he has adopted were appropriated, except, as we will

132 F.—49

say, the slide block and bell cranks, for which something else was substituted, infringement would not be made out, except by the very closest approximation, in view of the generic character of both devices with that of the Eck. But there is no such situation presented here. No one in the prior art has put together, in any equivalent combination, mechanism of similar general design. So far as it goes, as applied to switching cams, it is new of its kind and stands alone, on which the defendant's device (accepting the judgment of the Patent Office that there is a patentable difference) is at best a mere improvement, which does not avoid infringement by the interposition of slightly variant parts.

---

Free narrowing cams, or lifters, in combination with two-needle widening cams, or droppers, for use in what has already been referred to as a two and one machine, is the third automatic device in controversy. This is covered by the same patent as the one just disposed of, claims 8, 9, and 14 of which are particularly relied upon, as follows:

"(8) In a knitting-machine, the combination with the cam cylinder and the fixed cams, H' H' H² and K K, and pivoted cams, H and G G, of the throwing-down cams, having hooked ends arranged to automatically lower two needles at the end of a raised series, pivoted arms carrying said throwing-down cams, cross-arms, E, throwing-up cams arranged to re-raise one of said lowered needles, said throwing-up cams being independent of said cross-arms and having weighted ends.

"(9) In a knitting-machine, the combination of free narrowing-cams with widening-cams constructed and arranged to throw down two needles at once."

"(14) In a knitting-machine, the combination of the needles, narrowing-cams independent of controlling devices, and widening-cams constructed to engage two adjacent needles."

In the first of these we have a specific combination of the customary stitch cams for straight knitting with two-armed pivoted throwing-down cams, or droppers, of the same character as those described in the first patent, except that they are arranged to throw down two adjacent needles, instead of one; similar cross-arms for co-ordinately controlling them; and throwing-up cams or lifters, independent of such control and calculated by reason of their weighted ends to fall into operative position when not otherwise raised out of it. The other two claims are broad ones, for the two single elements of narrowing cams, either free or independent of controlling devices, and two-needle widening cams; the distinction between the two, which admittedly is a narrow one, residing in the description of the narrowing cams, which, speaking subjectively, may be said to be free when they are so arranged as of themselves to be always in operative position to perform the work required of them, and to be independent of controlling devices, speaking objectively, when, differentiating them from such machines as the Mayo and others, every device of the kind for any purpose, and whether in operation or out of it, is dispensed with. While the difference between the two may seem slight, I am not prepared to say that it is not substantial, nor that both may not be necessary to protect against the possible ingenuity of infringers. Assuming the three claims to be valid,

infringement is conceded, whichever is resorted to; and it could not well be denied, as everything has been appropriated by the defendant bodily.

The discovery of the complainant, which is the basis of the invention embodied in these claims, was that in a machine operated on the two and one principle, throwing-up cams or lifters, so pivoted as to fall into operative position by their own weight, could be left free, and controlling devices such as he had made use of in his earlier patent could be discarded. As these were to be found extensively elaborated in every existing machine, this was a material advance in the direction of more complete automaticity, the recognized objective of all inventive effort in this branch of the art. The way this is worked out is most interesting. In the two and one process, the stitches along the seam or gore, which unites the two sides of the heel, are made by drawing down two needles at each end of the idle series with each reciprocation of the cylinder; but as this, without proper compensation, would lessen the number of the stitches, which must remain unchanged, one needle is thrown up again to make this good. In adopting this method of knitting the throwing-down cams or droppers are enlarged, so as to engage and carry down two needles, instead of one; and the lifters or throwing-up cams, to counteract this, are left in operation in widening, the same as narrowing. Where this is accomplished by means of free lifters, they are allowed in full knitting to ride uncontrolled on the needle butts, which hold them out of place by the unbroken front which they present. But when the point for narrowing is reached, and the half-back needles are switched up, a gap being made in the line, the lifters fall into position for appropriate action. As then the advancing series of needles encounters them, the first needle is thrown up out of operation, while the rest continue on along the stitch cams unaffected, the intervening butts preventing the lifters from falling back until all have passed; and the same is the case throughout the process of widening, the two needle droppers being simply thrown in when it is to begin. When widening is completed, and the half-back needles are thrown down by the switch cam, the gap in the line of needles being closed, the lifters ride on the butts as before. In all the three steps, therefore, of full knitting, narrowing, and widening, the lifters are self-controlled; their action being unfailingly secured simply by the manipulation of the other parts, by which the change from one process to the other is brought about. The adoption of this as the approved practice in modern automatic knitting abundantly attests its utility and value as a material contribution to the art.

It is strenuously contended, however, that the complainant was not the original or first inventor; this honor being claimed for J. A. Burleigh, who was associated with C. E. Boyden and Rodolph Berry in the Providence Knitting Machine Company, of Providence, R. I. This company was organized by Burleigh some time in the summer of 1894 for exploiting a knitting machine called the "Victor," in which semi-automatic heads furnished by the Boss Knitting Machine Company under the first patent in suit were used; and it is asserted that free lifters, in a two and one machine, were devised by him and put into operation at the company's works in November or December of the

same year. As this, if established, antedates by several months the complainant's application, which in the first instance stands as the date of the invention, it deprives him of the right to lay claim to it, unless he can carry its origin back of that. But the defendant is met at the outstart by the fact that Burleigh on May 24, 1895, a week after Eck, made application for a patent embodying his ideas, and upon an interference being declared between them, into which a third party named Rowe, who was also in the Patent Office with a similar device, was drawn, the proceedings ended in a disclaimer by both Burleigh and Rowe, and the granting to the complainant of the patent in suit. This result does not, it is true, conclude the defendant. He may still show, if he can, that the facts were otherwise; that Burleigh, notwithstanding his declaration to the contrary, was the real inventor; and that the complainant in consequence has no right to that pretense. But he is necessarily at a serious disadvantage in seeking to do so, because he has to maintain that he is better advised in the matter than Burleigh himself was in entering his disclaimer, and that, notwithstanding the presumption that it was done with full knowledge, it was nothing less than a mistake on his part to make the concession.

To relieve from the stress of this, it is urged that Burleigh did not withdraw after the facts had been developed by testimony and an adverse adjudication made against him, but before anything of this kind had taken place, and by way of compromise. In proof of this it is pointed out that, while Rowe took out a license for which he paid $300, the Providence Knitting Machine Company, with whom Burleigh was associated, received as a consideration for his disclaimer a free license to make, use, and sell machines in accordance with the invention within the United States during the full life of the patent, and to authorize others to do so; the only restriction being that there should be no sublicensing. Undoubtedly this makes the withdrawal less significant than if it had been purely voluntary, the rights secured to the Providence Knitting Machine Company being almost equivalent to a divided ownership, and the case does not present the features, therefore, to be found in Shoemaker v. Merrow, 61 Fed. 945, 10 C. C. A. 181, on which reliance is placed. But, if the battle was somewhat of a drawn one, the honors were with the complainant; priority of invention being conceded, whatever he had to part with to obtain it. He may have bought peace at a large price, but not without a distinct and unqualified admission that he was the real inventor, the effect of which must be faced.

How far, then, has the result of the interference proceedings been overcome? The date assigned to the invention by Burleigh, as already stated, is November or December, 1894, when cam cylinders with free lifters and two-needle droppers are said to have been constructed at the works of the Providence Knitting Machine Company. Several parties who were in the employ of the company at that time testify that this was done, and particularly Kimball, Wiggin, and Jones; the first two producing the cam cylinders which they claim to have so changed. There are some discrepancies in their stories, but it is made clear by other evidence that by the last of January, 1895, at least, the Providence Knitting Machine Company had developed cylinder heads of this character; and, as such things are not made in a day, credence is thus given

to the other and earlier date. On January 29 a letter was dictated by Burleigh from the Providence Knitting Machine Company to the New Albany Hosiery Mills, a customer in Indiana, in which it is stated that they were sending them a machine with a new needle motion and stitch on heel and toe. This, it is declared, was a machine with the improvements in question upon it, in confirmation of which, on March 1 we have a letter from the New Albany Company complaining of the cams and asking for new ones; it being significantly charged against them that they were always loose and in action. To this Burleigh replied by letter of March 4, expressing surprise that the action of the cams was not understood, and explaining:

"We narrow up our needles in the usual way. * * * Then we throw the throwing-down cams into action, and widen by throwing down two needles at a time; and after we have thrown down two needles we raise one, the throwing-up cams being always in action."

Here is unimpeachable documentary proof of the complete realization of the invention in a commercial machine, and it requires but little in the face of it to convince one that the parties were possessed of it, as they claim, in November or December, a month or two previous. On the strength of it we may also properly accept the statement that it is this that is referred to in the letter of January 21 to the Boss Knitting Machine Company, dictated by Burleigh, in which he declares that they had overcome the trouble with the dropping of stitches at the heel and toe, as well as cheapened the cams; and that the call for unhardened droppers, which appears in the letters of January 21, 26, and 29 had also to do with the same matter; it being shown by Kimball and others that, after various experiments, two-needle droppers were found to be best made by obtaining them in that condition, filing them out so they would take two needles, and then hardening them.

The conclusion which is so reached renders it unnecessary to discuss at any great length the Deininger incident on the one hand, and the alleged communication to Eck of Burleigh's invention on the other; a part of the case which is the subject of much controversy. With regard to Deininger, I am not convinced that he was anything more than a self-constituted spy, and that is evidently all that Eck thought him, being content to resume relations with the Providence people, notwithstanding they had been in communication with him. It is no credit to the members of that company that they were ready to avail themselves of Deininger's offer to sell the information which he claimed to have as to certain improvements which Eck had in contemplation. And it is undisputed that they paid him money and took him to their patent solicitor at Washington, while he was in Eck's employ and confidence; nor can the odium be shouldered altogether onto Burleigh. But whether they repented of it, or whether Deininger—impostor as well as informer—had little or nothing to disclose, particularly after Eck had found him out and discharged him, they threw him over in the end, and made a clean breast of the matter to Eck, to whom Deininger also meanwhile had confessed. While, as it turned out, the incident is without significance, such an attempted theft of the ideas of another as is indisputably shown would warrant the most extreme presumptions, if there was occasion to apply them.

But, on the other hand, if nothing in Burleigh's device can be attributed to disclosures obtained from Deininger, neither can anything in that of Eck be traced to Burleigh; there being no communication between them on the subject until long after Eck had his machine completed. I cannot stop to discuss the evidence, but it is clear to me that not February 4, but April 17, or thereabouts, is the date to be assigned to the visit of Burleigh and Berry at Reading, with their new cam heads, on which occasion it is charged that Eck got the idea of his invention. On the earlier date they plainly came to meet Deininger, as arranged with his representative Babbitt, and him alone. They were certainly there to see him on February 4, and it is most unlikely that they would at the same time go to Eck with what they had, in view of what they were planning to get from him through Deininger. And, more than that, if either party had learned of the invention of the other, as was afterwards the case, neither would have delayed until May in getting in his application. It was at the stormy interview, which unquestionably was in April, when Burleigh and Berry, coming to Eck's shop at the noon hour, found his machine exposed, and discovered that it was a duplicate of their own, that mutual disclosures were made, each party maintaining his priority, and subsequently racing for the Patent Office. But, as already intimated, it is not material. The question which of the two was the real inventor is to be decided according to the showing that can be made, without regard to the incident. The only thing is that Eck cannot be charged with having got anything out of it. He is still required, however, in view of the evidence as to the invention by Burleigh, although aided by the presumption arising from the latter's disclaimer, to carry his own invention back of the preceding November, upon which, in the last analysis, his right to priority depends.

But, whatever the burden cast upon the complainant, in my judgment it has been fully met. It is clear that as early as July, 1891, Eck had a complete conception of his present device, substantially as it is now asserted, reducing it, also, to practical form; and although, for reasons of his own, he let the matter rest for upwards of three years, there was no abandonment of his ideas, which he put into still more exact shape in September, 1894, some two months prior to the earliest date assigned to the discovery by Burleigh. The attempt is made to charge Eck with having got his original impulse from Kelly, with whom he had some dealings, in the effort to exploit a joint cylinder head, and to a limited extent this may be true. Kelly says that in 1885 he had a two and one machine, and disclosed in 1889 to Eck his experiments with it, with which Eck was carried away, and thought he ought to apply for a patent. But, whatever Kelly had, he abandoned it as impracticable, and if Eck got any ideas from him he made them his own. The earliest form in which they took definite shape was in July, 1891, as already stated, when Eck rigged up one of the Eck-Kelly heads, which he had, with lifters and droppers. The lifters in this device were so arranged as to be without control, except as they were drawn down into place by exterior set springs, being thus always in operative position; and the droppers were enlarged, so as to take down two needles, instead of one. The head in this shape was put into a machine and stockings

knit upon it, so that it became the practical embodiment of the invention, as it now appears in claims 9 and 14, except in so far as the lifters were held down by set springs, which do not detract from it however, having merely the effect of weighted ends. This cylinder head has been preserved, and is produced in evidence. It was set up in Eck's repair shop at Kutztown, and seen by a number of different people there, prior to his removal to Reading, which occurred in September, 1891. Among those to whom it was exhibited were Edwin H. Eck, a son, and Katie Eck, his wife (then Katie Malick), Ellen Diefenderfer, a stepdaughter, Milton T. Donmoyer, a neighbor, and Harry Y. Yocum, a stocking manufacturer. If the reliability of the first of these is questioned, because of relationship, that of the last two cannot be; but I do not see that either of them should be doubted. Without going into their testimony in detail, it is sufficient to say that, both as to time and manner of occurrence, it is convincing. Drawn, as it is, from different and independent sources, the combined effect is not to be resisted. It establishes with certainty that, as already stated, the complainant as early as July, 1891, not only had conceived the idea of a two and one machine fitted with lifters which did not have to be thrown in or out, but had reduced it to operative form as shown by the exhibit. The machine may not have been practical, in the sense that it could have been employed commercially, because it worked too hard; but that does not prevent it from standing as a reduction to concrete form of the conception which is the basis of the invention.

It is said, however, that the idea, such as it was, was given away to Yocum, who made use of it in his mills for a number of years, and that all that there was of patentable invention thus became public property. It seems that after Eck had shown to Yocum the machine which he had, and had told him that the two and one method was the remedy for preventing dropped stitches in the heel and toe, Yocum put it in practice on one of his machines, making use of the automatic lifters with which it was fitted to raise the one needle, and throwing down the two by hand, and that this was kept up until a few years ago, when it was supplanted by the present machines. But this, at the best, was nothing but a crude and imperfect use of the two and one method, admittedly old, aided by automatic lifters. And while it is true that these must have been left in operation in widening as well as narrowing, the significant thing is that in no sense were they uncontrolled. In addition, therefore, to the circumstance that no droppers were used, it falls far short of realizing the complainant's invention, or any part of it. The public had nothing when they had it all.

But it is said that whatever was accomplished by the complainant in 1891 was not followed up, and must therefore be regarded as an unsuccessful and abandoned experiment. It is no doubt the case that little further was done with the subject of free lifters until some three years later; the complainant being occupied meanwhile with the affairs of the Boss Knitting Machine Works, which he organized at Reading in September, 1891, and which was taxed to its full capacity from the start in turning out the so-called "Boss Machine," fitted up with lifters, but no droppers. The fact, also, is that Eck was hampered for want of a satisfactory dropper, and until he had produced one his ideas could

not be made practicably available, depending, as they did, on lifters and droppers co-operating. His attempts in this direction did not succeed until he had developed the co-ordinated double-jointed droppers discussed above; and the want cannot, therefore, be said to have been supplied until July, 1893, when a machine fitted out with them was put upon the market. There is still a year to be accounted for. But as the prior Boss machine, with lifters only, had been well received, so also was the new one, equipped with droppers also, and, the public being satisfied, the immediate stimulus to further improvement was wanting. In addition to that, Eck himself was poor, and the company with which he was associated had very limited capital to indulge in new experiments. Neither was there any particular object in free lifters in a semi-automatic machine, each of which requires an operator; a circumstance which serves to some extent to explain why we find nothing of this invention in the first patent in suit, applied for by Eck about this time. It is in a machine three-quarters automatic, or higher, that the peculiar advantage of dispensing with controlling devices is experienced, and this, so far as Eck was concerned, had not yet been reached. Not, therefore, until July, 1894, was any further progress made.

But in that month Eck attended a knitting exhibition at Blood Bros. & Jackson's, at Philadelphia, to which Burleigh had brought two attempted full-automatic Victor machines. These machines, instead of the customary weight, had a sinker top to feed off the knitting; but according to Eck they made bad work on the heel and toe, this arrangement not being particularly effective, except in a two and one machine. For this, however, he had a remedy, and the opportunity for developing his dormant ideas seemed at last to be at hand. Returning to Reading, he set to work again on a machine which should combine the advantages he had seen with those which he himself was able to contribute, and he soon produced the desired result. Taking a cam cylinder, such as the Boss Knitting Machine Company was then putting out, he cut off the heels of the lifters, leaving them free and uncontrolled, and replacing the droppers with others having a larger lip, which would take down two needles, instead of one. By these changes, slight though they were, a new character of machine was produced. The original has been hunted up and put in evidence, and bears out all that is said of it. In October, 1894, Eck showed it to his son, Edwin H. Eck, who had returned to Reading and gone into the employ of the Boss Knitting Machine Works, the date of which, as fixed by the books of the company, was September 25; and a few weeks later Edwin showed it to his brother Elmer, without his father's knowledge. It was not shown to the defendant, Kutz, however. A controversy having arisen between him and Eck with regard to the payment of royalty to the latter on his earlier patent, which Kutz did not like, and the difficulty by this time having become acute, Eck concluded to keep things to himself. The reason why Kutz did not discover the machine was probably because it was kept covered in a box in a corner. If it seems odd that nothing was said about the invention to Miss Diefenderfer, a relative and business associate, and yet that it was confided to Deininger, an entire stranger, idiosyncrasies of that kind do not necessarily have

to be accounted for in order to justify belief. Sometimes, on the contrary, they confirm it; for they show that the story is not made up. From this time on until he filed his application, Eck was busily engaged in perfecting reciprocating machinery and other parts necessary to give full effect to his invention, the details of which do not need to be followed. The first commercial machine was sold May 9, 1895; but prior to that, in the latter part of 1894 or first of 1895, a few old cylinder heads were changed over in the mill of Nolde & Horst at Reading, so that the completed device was first put into actual commercial use at that time and place. This is testified to by Jepsen, the foreman, a witness for the defendant, who says that he realized it was very valuable for the knitting art.

It is manifest, from this detailed review, not only that the complainant was the real author of the invention, but that nothing can be made out of his failure to make use of it for three years after the original conception. Except the mere fact that he let it lie dormant, there is nothing to show that he intended to abandon it, and the sequel abundantly proves that he did not. He simply waited for a proper opportunity, and when it came he seized it. An inventor, if he keeps his ideas to himself, can take his own time to develop and perfect them, subject only to the risk that others meanwhile may become independently possessed of the same. Bates v. Coe, 98 U. S. 31, 25 L. Ed. 68; Consolidated Fruit Jar Co. v. Wright, 94 U. S. 92, 24 L. Ed. 68. To obviate this, however, he is held to the exercise of reasonable diligence; but the neglect of it goes merely to the question whether he should be given a patent as against another, who is seeking it for the same device, or whether, having obtained it, he is entitled to assert it against intervening rights. It has no bearing on the question whether he was the original and real inventor, which is the issue here; nor, it may be added, is abandonment to be predicated on mere delay. Mast, Foos & Co. v. Dempster Mill Mfg. Co., 82 Fed. 327, 27 C. C. A. 191.

In whatever way we look at it, therefore, the complainant is entitled to maintain his own priority. Not only is his invention carried back by satisfactory evidence to the earliest date assigned for it, in July, 1891, and due diligence under all the circumstances established therefrom; but, even if this were not so, and the question of diligence were material, by the second reduction to practice in the summer of 1894 he anticipated by a sufficient margin his immediate competitor, Burleigh, and still retained his lead. If it be said that the proof of the latter depends on the testimony of the complainant and his two sons, mindful of what has been ruled above, it may be answered that, not only do they tell a consistent and convincing story, but, in view of what was accomplished by Eck in his earlier efforts in the same direction, it naturally requires much less evidence to persuade the candid mind of its truth. Material corroboration is also to be found in the changes which were made in Nolde & Horst's mill in the latter part of 1894 or first of 1895, which the defendant himself has proved; for, allowing a suitable interval prior to that for the development of the invention before it was put into actual use, for which two or three months would seem none too much, practically the same result is reached.

But it is contended that the claim of Eck to priority over Burleigh is irreconcilable with his admission to Jepsen that the idea originated with the Victor Knitting Machine Company, of which Burleigh was the head. Just when this interview with Jepsen took place is not stated; but assuming, as argued by defendant, that it was probably in May, 1895, when the first machine to Nolde & Horst was sold, it is hardly conceivable that at the very time when Eck was strenuously asserting his own priority he should by any such admission have given it entirely away. It must be that we have not the whole of the conversation; that which we have, also, being not a little confused. But, even according to Jepsen's own statement, Eck declared that he had had the idea six years before at Kutztown, which corresponds with what has been shown. And while, according to the same, Eck declared that it never occurred to him to put these cams on his machines, this could only have referred to his earliest conceptions; for it flies in the face of the fact that at that very time he had done so. Admissions based upon imperfect memory are always to be closely scrutinized, and this one, if accepted, merely goes in for what it is worth with the rest of the evidence, which it is not sufficient to overcome. It is more than offset, to say nothing about the rest, by the absolute disclaimer of Burleigh, about which there can be no doubt.

It is further urged, however, that according to the recitals of the patent in suit the present invention is merely an improvement on the prior one, and that this not only discredits the pretensions of the complainant, by which he seeks to carry it back of that, but that, in accepting the patent in that form, he bound himself to this as an essential condition of the grant, which estops him from asserting anything to the contrary. But no such result necessarily follows. Even if the invention, by reason of the recitals referred to, is compelled to take its place in the art as an improvement, there is nothing in this which precludes the complainant from establishing, if he can, that the inventive idea of which it is the embodiment was antecedent to that. He did not have to put all his ideas into the prior patent, at the risk of losing them; and while the fact that nothing was there brought forward such as is now contended for may furnish an argument against its existence, based on the probability that he would be likely to make use of what he had at the earliest opportunity, it goes no further. Undoubtedly, with respect to the former machine, the present device is an improvement; but the relation, and the conception of the idea, are two separate and distinct things, and the inventor cannot be said, in the recitals as to the one, to have made any representation or avowal as to how or when he became possessed of the other.

Accepting, then, the conclusion, which, as shown by this discussion, is sustained by the decided weight of the evidence, that Eck was the original and real inventor, the further question remains whether anything patentably novel is to be found in the claims under consideration. There was nothing new, of course, in the use of the two and one process of knitting. Mayo employed it successfully, with the same co-operation between lifters and droppers by which one put up one needle as the other threw down two. But in the Mayo machine the lifters and droppers, as we have already seen, were successively thrown and latched

in and out of operation with each reciprocation, by special devices which, however automatic, involved direct regulation and control. The idea that any of this could be dispensed with is nowhere suggested in it, just the opposite speaking throughout the whole. It may be that the Mayo was capable of being made to operate in the same way as the complainant's machine, by discarding the devices for controlling the lifters; but, if capable, it was not arranged for it, and the difference is everything. Neither can it be said that the requisite change consists in the mere rejection of useless and functionless parts. I am not prepared to say that, even so, it might not amount to invention, if, with a reduction and simplification, the same degree of automaticity was obtained. But, without stopping upon that, the parts dispensed with are not functionless, as employed, but only as they are rendered unnecessary by the substitution by which they become so. The possibility for this may have been there, but it remained for the complainant to perceive and develop it. Inventive discovery, as was admirably said at the argument, involves the intelligent apprehension of relations not before recognized by others, although actually existing, followed by the conception of how they can be practically utilized; and that describes the situation here. It may not have been necessary to throw and latch out the lifters in the two and one Mayo (although it was in the one and one machine put out and contemporaneously patented by the same inventor); but it took more insight than he possessed to appreciate it, skillful as he is shown to be by the production of a full automatic machine; a fact that goes far to establish, not only the originality of the complainant's device, but the inventive genius required to evolve it.

Neither can it be successfully said that lifters, uncontrolled, except by springs or their own weighted ends, such as the complainant himself makes use of, were old in the art, and that novelty is therefore made to depend on the mere circumstance that the lifters are left in operation during widening as well as narrowing, which is effectively met by the Mayo. It is true that in the references relied on for this position—the Kelly, Hirner, Paxton and O'Neill, Reid and Stevenson, Breaithwaite and Hepworth, and prior Boss machines—the lifters are so arranged that they fall or are projected into operative place when the influence of the devices by which they are controlled is withdrawn. But these devices are present in each, and are potential factors which cannot be put out of the account. Eck's discovery was that they could be, and the lifters be left to take care of themselves during every part of knitting, provided the two and one process was used; thus differentiating from every other machine which had preceded him in the art, the Mayo as well as the rest.

It is said, however, that the patent nowhere suggests that the lifters are to ride free on the needle butts in full knitting, about which so much is made. It is true that nothing is specifically said upon this subject, but the omission is not material. The operation of the lifters, as affected by the passing needles in the process of narrowing and widening, is given at large in the specifications; and where, as in claim 14, they are to be independent of controlling devices, the other is necessarily implied. It is well established that an inventor is entitled to everything clearly residing in his invention, which is not lost to him be-

cause it is not claimed, and this may well be applied to supply anything which is lacking here.

It is further contended, however, with respect to the eighth claim, that the combination which there appears is identical with that which is to be found in the first Eck patent, excepting certain slight structural changes made necessary to adapt it to two and one fashioning. But the distinction between the two is not to be slurred over in that way. It is true that in general character the two combinations are alike; but the changes from one to the other, though slight in extent, are significant in effect, being nothing less than the freeing of the lifters from control, whereby the automaticity of the machine is sensibly increased and a material advance in the art attained.

The effort is also made, by an involved and somewhat refined argument, to dispose of the claims under consideration, by first impressing upon them separately a certain construction and then offsetting them the one against the other, in this shape, so as to make them mutually destructive. It is said, for instance, that, in order to distinguish and save claims 8 and 9 from claim 14, they have to be made broad enough to cover a machine in which the lifters do not ride freely during full knitting, but, on the contrary, at some stage, require direction by the operator, or by the machine itself (other than that effected by the needle butts); or, in other words, a machine in which full knitting is not taken into account; thus carrying the claims beyond the scope of the invention, from which, according to the complainant, the action of the lifters during full knitting cannot be left out. On the other hand, with respect to claim 14, it is charged that, dealing on its face as it does solely with narrowing and widening, the only independence of controlling devices material to that combination is independence during the process of fashioning, to which the qualifying description of the lifters must consequently be understood to refer. Novelty, as it is said, cannot be predicated upon anything outside of this, such as that the lifters ride freely on the needle butts during full knitting; this being nothing which results from the co-operation of the elements combined. In function and mode of operation, according to this, claim 14 is the same as claim 9, and to make it otherwise you have got to import into it something which is not of the essence of the invention and is not specified as such in the patent; and the proposed construction that "independent of controlling devices" means independent at all times, whether in operation or out of it, thus not only carries the claim outside of the process to which in terms it relates, but also beyond anything to which the patent itself lays claim. By this line of argument, as it will be noted, claim 9 and claim 14 are both held bad upon the same ground, to wit, that, according to the construction required to be severally given them, each is carried beyond the bounds of the invention. It is curious to observe, however, that in order to effect this the invention is made to shift; being extended in the one instance to include full knitting, which, quoting the complainant, it is said cannot be left out of the account; and in the other being confined to fashioning, with the right to consider full knitting denied. All this, in the effort to distinguish the two claims, so that one peradventure may be saved. But it is manifest that on no true and consistent basis of

construction can both be bad. If they duplicate each other, one is to be thrown out while the other stands, and the only effect on the case is one of costs. There is no occasion, however, for any question of that kind to arise. While admittedly the distinction between the two claims is a narrow one, I see no reason for departing from that which has already been given, that is to say, that one has strictly to do with the process of fashioning, and that the other includes full knitting also; the narrowing cams or lifters in the one instance being said to be "free," when they are free operatively; and in the other to be "independent of controlling devices," when that is true of them at all times, whether in operation or out of it. And while it is true that the lifters and droppers co-operate only in the process of narrowing and widening, to which the invention is therefore immediately addressed, their individual as well as their combined relation to other parts cannot, as a practical consideration, be left out of account, and a provision with respect thereto may thus be regarded as falling legitimately within its concern and scope.

Finally, it does not detract from the invention that certain operatives in Nolde & Horst's mill, using the earlier Eck machine, allowed the lifters to go uncontrolled in full knitting, if that was in fact the case. At most this was merely an accidental and unappreciated use of one feature of the invention. The lever controlling the lifters and droppers, as a matter of supposed handiness, was simply left down until widening was reached. The result, of course, was that the lifters rode on the needle butts during full knitting; but they had eventually to be thrown out, and were therefore in no sense free or uncontrolled. The invention was thus far from realized, nor was anything of benefit contributed to the art. The only thing that can be made of the incident is the argument that there was nothing of invention in what Eck did; the possibility and advantage of allowing the lifters to ride free on the needle butts being shown to be obvious to persons of ordinary ability. But the answer is not far to find. Jepsen, although supposed to be entitled to the merit of the discovery that this could be done, and skillful as he undoubtedly was beyond the average, saw nothing further in it until his eyes were opened, but realized at once, when they were, how valuable the use which Eck had made of the idea was for the knitting art. Whatever the possibilities, therefore, it required the insight of inventive genius to recognize them and carry them forward into new and useful relations, which were by no means obvious to the ordinary mechanical mind.

Convinced, therefore, as I am that, notwithstanding all that has been said against them, these claims, as well as the others in suit, are valid and have been infringed, and the complainant being thereby shown to be entitled to recovery upon all the issues raised, the bill is sustained, and the defendant directed to account.